No. 16-1285, 16-1307

---

### IN THE EIGHTH CIRCUIT COURT OF APPEALS

---

JEANNIE MAY,

Appellee and Cross-Appellant,

v.

NATIONSTAR MORTGAGE, LLC,

Appellant and Cross-Appellee.

---

On Appeal from the United States District Court for the
Eastern District of Missouri – Case No. 4:14-cv-00578-CEJ

---

### APPELLANT NATIONSTAR MORTGAGE, LLC'S OPENING BRIEF

---

Jeffrey M. Tillotson, P.C.
State Bar No. 20039200
TILLOTSON LAW
750 N. St. Paul Street, Suite 610
Dallas, Texas 75201
(214) 382-3041 Telephone
(214) 501-0731 Facsimile

Kevin M. Abel, #39568
Rhiana A. Lauders, #56535MO
Amy E. Breihan, #65499MO
BRYAN CAVE LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 Telephone
(314) 259-2020 Facsimile
ATTORNEYS FOR APPELLANT
AND CROSS-APPELLEE

May 3, 2016

**ORAL ARGUMENT REQUESTED**

i

## SUMMARY OF THE CASE

This is a mortgage servicing case in which Appellant Nationstar Mortgage, LLC ("Nationstar") appeals from the trial court's entry of judgment on the verdict and denial of its motion for judgment as a matter of law. The jury found for Plaintiff/Appellee Jeannie May ("May") on her claims for invasion of privacy and negligent violation of the Fair Credit Reporting Act, and awarded her $50,000 in compensatory damages on each claim. The jury also awarded her $400,000 in punitive damages on her invasion of privacy claim. Nationstar brings this appeal to challenge the $400,000 punitive damages award because there was no clear and convincing evidence that it acted intentionally or recklessly in invading May's privacy, and as a result, the evidence supporting the jury's award of punitive damages was insufficient as a matter of law. In the alternative, the jury's award of punitive damages was unconstitutionally excessive.

Because oral argument will assist the Court in resolving these important questions, Nationstar requests 30 minutes of oral argument before the Court.

Appellate Case: 16-1285    Page: 2    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ................................................................... i

STATEMENT OF ISSUES PRESENTED ....................................... 1

JURISDICTIONAL STATEMENT ................................................. 2

CORPORATE DISCLOSURE STATEMENT ................................ 3

STATEMENT OF THE CASE ........................................................ 4

    A.   May Defaults on Her Mortgage But Gets Back on Track Through a Chapter 13 Bankruptcy Plan. .................................................... 4

    B.   Nationstar Makes Several Unintentional Mistakes in Connection with Ms. May's Account. ......................................................... 6

        1.   Nationstar sends an erroneous first monthly statement .................. 6

        2.   Nationstar Erroneously Debits Ms. May's Account. ..................... 8

        3.   Nationstar "Fixes" the Error but Only Temporarily. .................... 10

    C.   Ms. May Files Suit and Nationstar Discovers the Error and Resolves to Ensure It Never Happens Again. .......................................... 13

    D.   Ms. May Amends Her Suit and Seeks Millions in Actual and Punitive Damages at Trial. ................................................................ 14

    E.   The Jury Awards May a Fraction of the Compensatory Damages She Was Seeking and Awards Her Punitive Damages, Likely Intending to Cover Her Attorneys' Fees. ..................................................... 15

ARGUMENT ............................................................................... 17

    I.   THE JURY'S AWARD OF PUNITIVE DAMAGES MUST BE SET ASIDE BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT NATIONSTAR ACTED WITH AN EVIL MOTIVE OR RECKLESSLY IN INVADING MAY'S PRIVACY ........................................ 17

    A.   Standard of Review. ....................................................... 17

    B.   Punitive Damages are an Extraordinary Remedy, Reserved for Outrageous Conduct. ..................................................... 18

Appellate Case: 16-1285    Page: 3    Date Filed: 05/03/2016  Entry ID: 4395208  RESTRICTED

C.  There is No Evidence that Nationstar Acted With an Evil Motive or Recklessly ..................................................................................... 20

D.  Allowing the Jury's Punitive Damages Award to Stand Would Be Inconsistent with the Weight of Authority in this Circuit and Beyond. ... 23

II.  IN THE ALTERNATIVE, THE PUNITIVE DAMAGES AWARDED BY THE JURY WERE UNCONSTITUTIONALLY EXCESSIVE AND MUST BE REDUCED. ......................................................................... 28

A.  Standard of Review and Applicable Law. ............................................... 28

B.  The Jury's $400,000 Punitive Damages Award Based on $50,000 of Actual Damages Was Excessive. ............................................................ 29

  1.  Reprehensibility. ............................................................................. 29

  2.  Ratio of Punitive to Compensatory Damages. .................................. 32

  3.  Comparable Civil Penalties. ............................................................ 37

C.  The $400,000 Punitive Damages Award Must Be Reduced. .................. 38

CONCLUSION ................................................................................................... 39

CERTIFICATE OF SERVICE ........................................................................... 41

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ................................. 42

Appellate Case: 16-1285    Page: 4    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

# INDEX OF AUTHORITIES

**Page**

**Cases**

*Rowe v. Hussman Corp.*,
381 F.3d 775 (8th Cir. 2004) .................................................................... 18

*Bach v. First Union Nat'l Bank*,
149 Fed. Appx. 354 ................................................... 31, 35, 36, 37

*Bach v. First Union Nat'l Bank*,
486 F.3d 150 (6th Cir. 2007) ................................... 1, 35, 36, 37

*Bennett v. Am. Med. Response, Inc.*,
226 F. App'x 725 (9th Cir. 2007) ................................................ 38

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ...........................................................passim

*Boerner v. Brown & Williamson Tobacco Co.*,
394 F.3d 594 (8th Cir. 2005) .......................................................... 1, 34

*Conseco Fin. Serv. Corp. v. N. Am. Mortg. Co.*,
381 F.3d 811 (8th Cir. 2004) .................................................. 31, 34

*Cooper Indus., Inc. v. Leatherman Tool Group*,
532 U.S. 424 (2001) ........................................................................ 29

*Cortez v. Trans Union, LLC*,
617 F.3d 688 (3d Cir. 2010) ........................................................... 37

*DeLaRosa v. Farmers State Bank*,
474 S.W.3d 240 (Mo. Ct. App. 2015) ........................................... 27

*Eden Elec., Ltd. v. Amana Co.*,
370 F.3d 824 (8th Cir. 2004) *cert. denied*, 543 U.S. 1150 (2005) ........... 30, 34

*Fausto v. Energy Servs. Corp.*,
598 F.Supp.2d 1049 (N.D. Cal. 2009) ........................................... 26

*Franklin v. I.N.S.*,
72 F.3d 571 (8th Cir. 1995) ........................................................... 18

*Freeland v. Fin. Recovery Servs., Inc.*,
790 F.Supp.2d 991 (D. Minn. 2011) .................................. 1, 24, 25

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,
758 F.3d 1051 (8th Cir. 2014) .................................. 19, 22, 26, 27

Appellate Case: 16-1285     Page: 5     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

*Hoyt v. GE Capital Mortg. Servs., Inc.*,
   193 S.W.3d 315 (Mo. Ct. App. 2006) ........................................................... 19

*In re Levaquin Prods. Liability Litigation*,
   700 F.3d 1161 (8th Cir. 2012 ................................................................. 1, 23

*Inzerillo v. Green Tree Serv. LLC*,
   No. 13-CV-06010-MEJ, 2014 WL 1347175 at *8 (N.D. Cal. Apr. 3, 2014). 25

*Kemp v. Am. Tel. & T. Co.*,
   393 F.3d 1354 (11th Cir. 2004) ................................................................. 33

*Lee ex. rel. Lee v. Borders*,
   764 F.3d 966 (8th Cir. 2014) ..................................................................... 30

*Lewellen v. Franklin*,
   441 S.W.3d 136 (Mo. 2014) ...................................................................... 31

*Litchfield By and Through Litchfield v. May Dept. Stores Co.*,
   845 S.W.2d 596 (Mo. App. E. Dist. 1992 ......................................... 1, 20, 23

*Mathias v. Accor Econ. Lodging, Inc.*,
   347 F.3d 672 (7th Cir. 2003) ..................................................................... 33

*Ondrisek v. Hoffman*,
   698 F.3d 1020 (8th Cir. 2012) ............................................................. 34, 39

*Pac. Mut. Life Ins. Co. v. Haslip*,
   499 U.S. 1 (1991) ....................................................................................... 33

*Quigley v. Winter*,
   598 F.3d 938 (8th Cir. 2010) ....................................................... 30, 34, 39, 40

*Rodriguez v. Suzuki Motor Corp.*,
   936 S.W.2d 104 (Mo. 1996) ...................................................................... 27

*Romeo v. Jones*,
   144 S.W.3d 324 (Mo. Ct. App. 2004) ....................................................... 18

*Salve Regina College v. Russell*,
   499 U.S. 225 (1991) ................................................................................... 18

*Sanchez v. Client Servs.*,
   520 F.Supp.2d 1149 (N.D. Cal. 2007) ...................................................... 26

*Saunders v. Branch Banking And Trust Co. Of VA*,
   526 F.3d 142 (4th Cir. 2008) ..................................................................... 31

*Schooley v. Orkin Extermination, Co., Inc.*,
   502 F.3d 759 (8th Cir. 2007) ............................................................... 18, 27

Appellate Case: 16-1285   Page: 6   Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ....................................................... 1, 30, 32, 33

*Stogsdill v. Healthmark Partners, L.L.C.*,
  377 F.3d 827 (8th Cir. 2004) ......................................................... 34

*Trickey v. Kaman Indus. Techs. Corp.*,
  705 F.3d 788 (8th Cir. 2013 .................................................... passim

*TXO Prod. Corp. v. All. Res. Corp.*,
  509 U.S. 443 (1993) ...................................................................... 33

*U.S. v. Big D Enters., Inc.*,
  184 F.3d 924 (8th Cir. 1999) ......................................................... 33

*US v. Veal*,
  365 F.Supp.2d 1034 (W.D. Mo. 2004) ........................................... 30

*Wallace v. DTG Operations, Inc.*,
  563 F.3d 357 (8th Cir. 2009) ......................................................... 34

*Webner v. Titan Distribution, Inc.*,
  267 F.3d 828 (8th Cir. 2001) .................................................... 28, 39

**Statutes**

28 U.S.C. § 1291 ............................................................................... 2
28 U.S.C. § 1331 ............................................................................... 2
28 U.S.C. § 1332 ............................................................................... 2
28 U.S.C. § 1367 ............................................................................... 2

**Rules**

Fed. R. App. P. 32(a) ...................................................................... 42
Federal Rule of Appellate Procedure 26.1 ....................................... 3
Federal Rule of Appellate Procedure 4(a)(4)(A)(iv) .......................... 2
Local Rule 28A(h) .......................................................................... 42

Appellate Case: 16-1285    Page: 7    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

# STATEMENT OF ISSUES PRESENTED

Nationstar respectfully submits the following statement of the issues presented:

1.  Whether legally sufficient evidence supported an award of punitive damages when there was no clear and convincing evidence that the defendant acted with an evil motive or recklessly in invading the plaintiff's privacy?

    *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788 (8th Cir. 2013)

    *In re Levaquin Prods. Liability Litigation*, 700 F.3d 1161 (8th Cir. 2012)

    *Litchfield By and Through Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596 (Mo. App. E. Dist. 1992)

    *Freeland v. Fin. Recovery Servs., Inc.*, 790 F.Supp.2d 991 (D. Minn. 2011)

2.  In the alternative, whether the jury's award of punitive damages eight times the award of compensatory damages was unconstitutionally excessive?

    *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).

    *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

    *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005).

    *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 (6th Cir. 2007).

Appellate Case: 16-1285    Page: 8    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

# JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The district court also had jurisdiction pursuant to 28 U.S.C. § 1332. The jury returned its verdict on November 20, 2015, and the district court entered judgment on the verdict the same day. Nationstar moved to alter or amend the judgment on December 18, 2015, raising the same issues it presents here. The district court denied that motion on December 28, 2015. Nationstar filed notice of appeal on January 27, 2016. This appeal was timely under Federal Rule of Appellate Procedure 4(a)(4)(A)(iv). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Appellate Case: 16-1285    Page: 9    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant/Cross-Appellee Nationstar Mortgage, LLC states that it is a wholly-owned subsidiary of Nationstar Mortgage Holdings, Inc. No publicly held corporation owns ten percent (10%) or more of Nationstar Mortgage Holdings, Inc.

Appellate Case: 16-1285    Page: 10    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

# STATEMENT OF THE CASE

This is a mortgage servicing case that involves an unfortunate series of errors that Appellant Nationstar made in servicing Appellee Ms. Jeannie May's mortgage. At trial, Nationstar acknowledged that it made mistakes and it took full responsibility for the errors it committed. Yet Nationstar firmly rejected the assertion by May's lawyer that these mistakes were intentional or caused by an uncaring or callous corporation. The evidence at trial clearly demonstrates otherwise.

After a four-day trial, the jury found in favor of May on only two of her five claims and awarded her $50,000 in compensatory damages for each of them and $400,000 in punitive damages based on her invasion of privacy claim. J.A. 1976 (Jury Verdict).[1] Nationstar appeals the punitive damages award, and the following background facts/procedural history are relevant to the issues raised herein:

## A. May Defaults on Her Mortgage But Gets Back on Track Through a Chapter 13 Bankruptcy Plan.

In May 2007, Plaintiff May purchased a home in Overland, Missouri for $100,000 and took out a mortgage from Cornerstone for the full amount of the purchase price. Tr. Vol. 3 at 77–78. According to her statements, the monthly

---

[1] Nationstar cites to the parties' Joint Appendix as "J.A. ___"; Exhibits as "Ex. ____"; the trial transcript as "Tr. Vol. __ at ___"; and its Addendum as "Apdx. at __." The Exhibits are included beginning in Volume 4 of the Joint Appendix and are tabbed for ease of reference.

Appellate Case: 16-1285    Page: 11    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

payments on her $100,000 mortgage were $878.75. Within about 45 days of obtaining her mortgage, Cornerstone transferred the servicing rights for Ms. May's loan to CitiMortgage. Tr. Vol. 3 at 78.

A few months later, Ms. May began "having financial difficulty because of some life events" and stopped making payments. Tr. Vol. 4 at 5. By November 2007, she was seriously delinquent and filed for Chapter 13 bankruptcy. Tr. Vol. 4 at 8–9. Her goal in filing under Chapter 13 was to keep her house. Tr. Vol. 4 at 9.

Once in bankruptcy, Ms. May obtained a five-year payment plan comprised of her original monthly mortgage payments plus an additional amount to repay her pre-bankruptcy arrearages (including lender paid expenses and legal fees). Tr. Vol. 4 at 8. By 2010, Ms. May had again fallen behind and was five months' delinquent under her Chapter 13 plan. Tr. Vol. 4 at 10 (Ms. May testifies she fell five payments behind); Tr. Vol 3 at 115 (testimony that Nationstar filed a Motion for Relief from the Automatic Stay due Ms. May's delinquency under her Chapter 13 Plan). To avoid having her bankruptcy dismissed and possibly losing her home, Ms. May made a "catch up" payment of over four thousand dollars, which was the amount she was in arrears. Tr. Vol. 4 at 12; Ex. 32 (copy of her check).

During that same period (2010), Defendant Nationstar acquired the servicing rights to Ms. May's mortgage from CitiMortgage in connection with the purchase of a large portfolio of mortgages. Tr. Vol. 3 at 78. At that point, Nationstar

5

became her loan servicer. While Plaintiff May was in bankruptcy, Nationstar did not send her monthly statements. Tr. Vol. 3 at 84. This was consistent with Nationstar's standard policy for mortgagors in bankruptcy, as Nationstar did not want to confuse individuals regarding their obligations under the bankruptcy plans. *Id.*[2]

Having cured her delinquency in 2010, Ms. May then proceeded to make the remaining required payments under her Chapter 13 plan. Tr. Vol. 3 at 116. In January 2013, Ms. May completed her five-year Chapter 13 Plan and was discharged from bankruptcy. Tr. Vol. 4 at 12. Accordingly, Nationstar filed a pleading with the bankruptcy court confirming that Ms. May had satisfied all of her obligations and was not delinquent. Tr. Vol. 4 at 14; Ex. 30. Having emerged from bankruptcy, Ms. May was now obligated to make payments on her mortgage pursuant to the terms of the original loan. *Id.*

## B. Nationstar Makes Several Unintentional Mistakes in Connection with Ms. May's Account.

### 1. Nationstar sends an erroneous first monthly statement.

Once she emerged from bankruptcy, Ms. May contacted Nationstar and requested that she be sent a monthly statement. Ex. A at 8; Tr. Vol. 4 at 18–19.

---

[2] As Nationstar's corporate representative witness (A.J. Loll) testified, "[t]he statement would be confusing [because] the borrower and the courts and the creditors have agreed to a repayment plan. The repayment plan does not mirror the original documents they signed at closing." TR Vol. 4 at 84.

Appellate Case: 16-1285    Page: 13    Date Filed: 05/03/2016 Entry ID: 4395208   RESTRICTED

As mentioned above, no statements were sent to her while in bankruptcy. According to Ms. May, Nationstar's representatives told her that it would take a while to have a statement prepared. *Id.*

Ironically, Nationstar sent the statement right away, surprising even Ms. May. Tr. Vol. 4 at 18–19. Unfortunately, the statement was erroneous and reflected charges of several thousand dollars in erroneous "lender paid" expenses. Tr. Vol. 3 at 128–29; Ex. FF (copy of statement). "Lender prepaid expenses" are typically charges incurred by the lender on behalf of the borrower and are authorized to be reimbursed under the standard mortgage agreement. *Id.* However, because Ms. May was emerging from bankruptcy, these charges were not proper and should not have appeared on her statement. Tr. Vol. 3 at 128–30.

The uncontradicted evidence at trial was that the errors associated with this statement were unintentional. Nationstar's corporate representative witness, A.J. Loll,[3] testified that the errors likely resulted from the statement being sent out too soon before all matters could be resolved as her account moved from bankruptcy to regular status. Tr. Vol. 3 at 88-89. It is undisputed that Ms. May never paid the erroneous charges. Further, the charges were later removed. Tr. Vol. 3 at 130. At trial, Nationstar's corporate representative Mr. Loll testified that he had conducted

---

[3] Mr. Loll is a Vice President at Nationstar who was tasked with investigating Ms. May's complaints after she filed suit. Tr. Vol. 2 at 16. He was also empowered with the authority to implement any improvements at Nationstar based on what transpired in Ms. May's case. Tr. Vol. 3 at 55–57; 187.

Appellate Case: 16-1285     Page: 14     Date Filed: 05/03/2016 Entry ID: 4395208   RESTRICTED

a personal audit of Ms. May's account and that all improper charges had been removed and/or credited. Tr. Vol. 3 at 91–92; (Mr. Loll: "I did it pencil to paper, double-checked my work. And it reconciles to zero monies she paid. It was all cleared out off the account with Nationstar's funds."); Ex. 27 (Mr. Loll's review of statement).

### 2. Nationstar Erroneously Debits Ms. May's Account.

Nationstar then made a second, unintentional error on Ms. May's account around this same period. While this mistake caused much of the distress about which Ms. May later testified, there was no evidence to suggest that it was anything other than an unintentional error. The genesis of this error went all the way back to 2008, when the prior servicer, CitiMortgage, received a bulk check of $5,716 from the bankruptcy trustee intended as bankruptcy plan payments for several different loans. Tr. at Vol. 3 at 132; Ex. FFFFF. CitiMortgage mistakenly applied the entire check in 2008 to a single loan, a borrower named Jeannie Hoyt. Tr. Vol. 3 at 134. Notably, Ms. May's account was supposed to receive a small fraction of this bulk payment ($51) but she did not because the full amount was mistakenly applied (by CitiMortgage) to the other borrower's account. *Id.*

Five years later, Nationstar now owned the servicing rights for Ms. May's loan and, in reviewing her account as she emerged from bankruptcy, sought to reconcile Ms. May's loan over the $51 missing payment/credit. Tr. Vol. 3 at 132;

Ex. FFFFF.  In doing so, Nationstar realized the error made by CitiMortgage.  *Id.*

After confirming with CitiMortgage that it had made an error in applying the bulk

payment to a single loan, Nationstar sought to correct it by debiting Jeannie **Hoyt's**

account for $5,162.   Unfortunately, Nationstar unintentionally debited Appellee

Jeannie **May's** account rather than Jeannie **Hoyt's** account.  Tr. Vol. 3 at 132–134.

The undisputed evidence at trial was that this error was unintentional and not

the result of malice or conscious indifference. As Nationstar's Mr. Loll explained:

> Q:   Now, just before I ask you about what we've [Nationstar]
>      done about it, the actual debiting this to Ms. May's account
>      instead of Ms. Hoyt's, to the best of your ability through
>      investigation, was that the result of human error.
>
> A.   It was.

Tr. Vol 3 at 136 (lines 9-13).  This error, however unintentional, nonetheless did

result in transforming Ms. May's loan from current to five months delinquent.  Tr.

Vol. 3 at 143–44 (debiting of Ms. May's account for the bulk amount "translated"

her account into five monthly payments not made).

At that point in time, Nationstar viewed Ms. May as seriously delinquent.

Accordingly, Nationstar began calling Ms. May to inquire about the delinquency.

Every time Nationstar called Ms. May or she contacted Nationstar to complain,

Nationstar employees pulled up her account on a computer screen and saw that it

was seriously delinquent.  Tr. Vol. 3 at 118–20.  There was no evidence presented

9

that Nationstar ever intentionally sought to collect from Ms. May on a debt it knew was improper.

### 3. Nationstar "Fixes" the Error but Only Temporarily.

The error to Ms. May's account was made on March 27, 2013. Tr. Vol. 3 at 160. By mid-April, Ms. May received a statement indicating the (erroneous) amount owed and had received calls from Nationstar. Tr. Vol. 3 at 142-43. During one of the calls, a Nationstar employee explained to Ms. May why her account was (mistakenly) in arrears. According to the account notes entered on April 27, 2013 for Ms. May's account, the following took place:

> Talked to Ms. May. Ms. May called about foreclosure letters she received and that funds were misapplied to her account in an amount of $5,162.49 that were returned by Nationstar and were also reversed from borrower account, which is now in a delinquent amount and five payments behind.

Tr. Vol. 3 at 142–44; Ex. A at 427; s*ee also* Ex. M (transcript of April 27, 2013 call with Ms. May where she says to the Nationstar employee "[s]o the last time I called, I was told that CitiMortgage misapplied funds in 2008. They then sold the loan to you guys in 2010 and made you pay[.]"). Unbeknownst to Nationstar, it had the right problem (CitiMortgage had wrongly applied a bulk payment in 2008) but the wrong borrower.

Ms. May rightly disputed the matter and, during the April 27, 2013 call, was told by the Nationstar employee that the matter would be sent to her manager and

Appellate Case: 16-1285    Page: 17    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

the research department where they would "see if we can expedite it." Ex. M at 9:9–14; Tr. Vol. 3 at 147. Internal Nationstar emails indicated that Ms. May's materials were sent to the research department shortly after the call. Ex. 119; Tr. Vol. 3 at 149. The research department was unable to determine the exact cause of the problem but, on May 15, 2013, nonetheless decided to credit Ms. May's account for the entire amount. Tr. Vol. 3 at 158–59; Ex. 119 ("requested adjustment to bring loan current."). Thus, within 45 days of making the mistake (March 27) and about 15 days from promising Ms. May that the research department would look into it, Nationstar fixed the error. Tr. Vol. 3 at 160.

The "only" problem was that even though Nationstar's research department requested that the wrongfully debited amount be credited to Ms. May's account, the cash department (which actually funds the credit out of Nationstar's own money) mistakenly declined the request and sought to have it resubmitted. Tr. Vol. 3 at 160. The requested credit was declined due to a classic "mix up." The research department had indicated that the account should be credited from the Nationstar's internal bankruptcy fund but then removed the bankruptcy code from Ms. May's account. Tr. Vol. 3 at 160–62. The cash department subsequently declined the request because Ms. May's account was no longer in bankruptcy and therefore could not be credited from the bankruptcy fund. *Id.*

11

The entire matter might have been avoided had the request been re-submitted. However, the individual that had authorized the credit did not follow up to ensure that his direction had been followed. Tr. Vol. 3 at 160–63. This too was an unintentional error and not the result of malice or conscious indifference. Instead, the Nationstar individual testified that he had never previously had requested credit not processed and thus was generally not aware that he might need to follow up on the matter. Tr. Vol. 3 at 162.

The result of this error was that Ms. May's account was back to being designated as delinquent. Unfortunately, the collection process then started all over again. Ms. May rightfully declined to pay the erroneous amounts but, from Nationstar's perspective, she was in default on her loan. As a result, Nationstar followed the standard practice in handling her account. For example, Nationstar proposed a loan modification. Tr. Vol. 3 at 164-65.

While Ms. May rightfully refused the loan modification, her refusal triggered the next steps in how Nationstar handles what it believes to be a seriously delinquent loan. This included referring the matter to a lawyer for possible foreclosure. Ex. 50. Similarly, Ms. May obtained the services of a lawyer (Robert Healey). Tr. Vol. 4 at 92. By then, Nationstar was relying on its lawyer, who was dealing with Mr. Healey. Tr. Vol. 3 at 174. Nationstar's lawyer provided Mr. Healey with the payment history on the loan account. Tr. Vol. 3 at 13. Unable to

12

resolve the issue, Nationstar's lawyer went forward with posting Ms. May's home for foreclosure in mid-January 2014.

## C. Ms. May Files Suit and Nationstar Discovers the Error and Resolves to Ensure It Never Happens Again.

Shortly after her home was posted for foreclosure, Ms. May filed suit. The foreclosure was immediately stopped. J.A. 25. Thereafter, Nationstar never threatened to foreclose on her home again and never took any steps with respect to the prior foreclosure posting. Tr. Vol. 3 at 175.

In May 2014, Nationstar determined the error it had made in wrongfully debiting her account. In a letter sent directly to her in May 2014, Nationstar informed Ms. May of its mistake and corrected her account for the wrongful $5,162 debit. Tr. Vol. 3 at 61; Ex. 110. However, Ms. May's account still showed as past due because certain payments she had made the prior few months were being held in "suspense." Under her standard mortgage agreement, when a borrower is in arrears, only full payment in certified funds is accepted. During this period, Ms. May continued to make her monthly payments but Nationstar— erroneously believing those payments to not be sufficient to cure her "deficiency" held them in suspense. Tr. Vol. 3 at 167. In a letter sent to her in October, 2014, Nationstar recognized the issue and fully fixed the error. Tr. Vol. 3 at 64; Ex. 114. At that point in time, her account was fully credited.

13

**D.    Ms. May Amends Her Suit and Seeks Millions in Actual and Punitive Damages at Trial.**

Nonetheless, Ms. May pursued her lawsuit.  Unable to resolve the matter, the case proceeded to trial in November 2014. At trial, Nationstar owned up to making mistakes on Ms. May's account but strongly disputed that the mistakes were intentional or the result of a callous corporate defendant.  Tr. Vol. 3 at 136-37.

In fact, the evidence at trial overwhelmingly demonstrated that Nationstar's errors, while embarrassing and unacceptable, were unintentional.   Ms. May's lawyers struggled to paint Nationstar as a "bad" corporate actor, suggesting (but offering no evidence) that Nationstar's employees were "overworked," and that Nationstar had a financial interest in pushing borrowers such as Ms. May into foreclosure, and did not care about its customers.

These allegations fell flat because the actual evidence strongly contradicted Plaintiff's suggestions.   First, the evidence at trial proved that Nationstar actually earns more profits from its servicing activities if borrowers pay timely rather than become delinquent.  Tr. Vol. 3 at 95.  In fact, the evidence demonstrated that Nationstar loses money on foreclosures.  Tr. Vol. 3 at 100-01.  Second, the evidence at trial proved that Nationstar has strong incentives to treat its borrowers well and has undertaken numerous initiatives and efforts to further that end.  Tr.

14

Vol. 3 at 103-104.[4]  Third, the evidence proved that Nationstar's employees were not "overworked" and, to the contrary, Nationstar had spent significant sums of money to constantly improve its customer experience.  Tr. Vol. 3 at 106-107.  Other evidence offered by Nationstar confirmed these facts.  Finally, the evidence at trial overwhelmingly demonstrated that the errors on Ms. May's account resulted from none of the above issues suggested by Ms. May's lawyers but were the result of ordinary human error.  Tr. Vol. 2 at 15; 17–18 ("There was no 'cost cutting' and mistakes were the result of human error.")

### E.  The Jury Awards May a Fraction of the Compensatory Damages She Was Seeking and Awards Her Punitive Damages, Likely Intending to Cover Her Attorneys' Fees.

Ultimately, the jury found for Ms. May on only two of the five causes of action she had submitted: invasion of privacy and negligent violation of the Fair Credit Reporting Act.  J.A. 1976–80.  The jury squarely rejected Ms. May's claims for willful violations of the Fair Credit Reporting Act and Fair Debt Collection Practices Act and violations of RESPA.  J.A. 1977, 1980.  The jury also rebuffed Ms. May's request for $2-5 million of compensatory damages and $25 to $50 million of punitive damages, instead awarding her compensatory damages of $50,000 on each claim and $400,000 in punitive damages on her invasion of

---

[4] Nationstar recognizes that borrowers whose servicing rights they acquire did not "choose" Nationstar.  Thus, Nationstar wants to perform well with these customers so that they consider Nationstar as a possible option if they refinance their loan. Tr. Vol. 3 at 103-105.

Appellate Case: 16-1285     Page: 22     Date Filed: 05/03/2016  Entry ID: 4395208  RESTRICTED

privacy claim, despite the fact that it had rejected Ms. May's other claims involving elements of willfulness.  J.A. 1976-80.

These seemingly inconsistent findings are likely explained by the jury's first question, which was whether it could award attorneys' fees, indicating that the jury wanted to award May $100,000 in compensatory damages and cover her attorneys' fees. Tr. Vol. 5 at 71–72.   Over Nationstar's objection, the Magistrate Judge declined to instruct the jury that the Court would award attorneys' fees, likely leaving the jury to conclude that the $400,000 punitive damages award would serve to pay Ms. May's lawyers.  *Id.*   Ironically, the Court later awarded her attorneys almost $400,000 in fees and costs.  J.A. 2355–68.

In any event, regardless of whether that was the jury's true intent or not, there was no evidence whatsoever that would even remotely suggest that Nationstar's conduct was malicious or intentional.  Nationstar moved for a directed verdict on Ms. May's claims for punitive damages after close of her case and the evidence.  Apdx. at 7–26.  The motion was denied.  *Id.*  Immediately after the jury returned its verdict, the Court entered a judgment on the verdict, so Nationstar filed a post-judgment motion under Rule 59(e), arguing that the evidence to support the jury's award of punitive damages was legally insufficient.   J.A. 2369–75. Nationstar also argued in the alternative that the award of punitive damages was

16

unconstitutionally excessive. *Id.* The trial court denied Nationstar's motion and this appeal followed. J.A. 2392 (Order denying motion).

## ARGUMENT

I. **THE JURY'S AWARD OF PUNITIVE DAMAGES MUST BE SET ASIDE BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT NATIONSTAR ACTED WITH AN EVIL MOTIVE OR RECKLESSLY IN INVADING MAY'S PRIVACY.**

The issue presented in this appeal is whether conduct that is proven to be an unintentional mistake can satisfy the stringent standard for awarding punitive damages. Punitive damages are a drastic remedy intended to punish conduct that is willful or malicious. As detailed below, they have no place in this case. Although Nationstar admittedly made several mistakes in its servicing of Ms. May's mortgage, there is no evidence whatsoever that would even begin to suggest that Nationstar's foibles were anything more than *good faith mistakes* made without the slightest tinge of ill-will or malice. Because there was no evidence—much less clear and convincing evidence—that Nationstar acted willfully or with an evil motive in invading Ms. May's privacy, the jury's award of punitive damages must be set aside in its entirety.

A. **Standard of Review.**

Whether there is sufficient evidence to support an award of punitive damages is a question of law, which the Eighth Circuit reviews *de novo*. *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 799 (8th Cir. 2013) (citation omitted);

Appellate Case: 16-1285    Page: 24    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

*see also Schooley v. Orkin Extermination, Co., Inc.*, 502 F.3d 759, 764 (8th Cir. 2007) ("We review de novo the district court's denial of judgment as a matter of law."); *Rowe v. Hussman Corp.*, 381 F.3d 775, 779 (8th Cir. 2004) (same). On *de novo* review, an appellate court should reverse if it would have answered the question at issue differently than the court below. *Franklin v. I.N.S.*, 72 F.3d 571, 576 (8th Cir. 1995). "When *de novo* review is compelled, no form of appellate deference is acceptable." *Id.* (citing *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991)).

Judgment as a matter of law is appropriate "where the evidence adduced at trial is entirely insufficient to support the verdict." *Schooley*, 502 F.3d at 764. On appeal, the Court considers all the evidence in the record without weighing credibility, and "resolve[s] conflicts and make[s] all reasonable inferences in favor of the non-moving party." *Id.* Such inferences are only reasonable, however, when they "may be drawn from the evidence without resort to speculation." *Id.* (internal quotation and citation omitted).

## B. Punitive Damages are an Extraordinary Remedy, Reserved for Outrageous Conduct.

"Punitive damages are an extraordinary and harsh remedy and should be applied only sparingly." *Trickey*, 705 F.3d at 799 (quoting *Romeo v. Jones*, 144 S.W.3d 324, 334 (Mo. Ct. App. 2004)). Before they can be considered, "a plaintiff must present clear and convincing evidence of evil motive and reckless

18

indifference to the plaintiff's rights." *Id.*; *see also Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1060 (8th Cir. 2014) (noting that in Missouri, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others" (citation omitted)).  Evidence is considered "clear and convincing" if it "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and if it causes the fact finder to have an abiding conviction that the evidence is true." *Id.*

Put another way, "there must be clear and convincing proof of a defendant's culpable mental state," meaning that "the defendant committed an intentional wanton, willful, or outrageous act without justification or acted with reckless disregard for the plaintiff's rights and interest."  *Id.* (citations omitted); *see also Hallmark Cards, Inc.*, 758 F.3d at 1060 (explaining that the requisite mental state exists "when a person intentionally does a wrongful act without just cause or excuse" or "[w]hen someone intentionally commits a wrong and knew that it was wrong at the time"); *Hoyt v. GE Capital Mortg. Servs., Inc.*, 193 S.W.3d 315, 323 (Mo. Ct. App. 2006) ("For intentional tort cases, punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard, *from which evil motive is inferred*, for an act's consequences.").

**C.     There is No Evidence that Nationstar Acted With an Evil Motive or Recklessly**.

Fatal to Ms. May's claim for punitive damages, there was no evidence introduced at trial that would even remotely indicate that Nationstar's actions in violating Ms. May's privacy, or any of its conduct in this case, was anything more than a series of unfortunate but unintentional mistakes and errors.  Under well-established Missouri law, such conduct is not enough to warrant punitive damages. *See Litchfield By and Through Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596, 600 (Mo. Ct. App. 1992) ("Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence." (internal quotations and citation omitted)).

There certainly is no evidence that the employees at Nationstar who told May her account was delinquent *knew* she was actually current yet maliciously tried to push her toward foreclosure.  All evidence at trial thoroughly demonstrated that every Nationstar employee who dealt with Ms. May believed her to be delinquent.  Nor was there any evidence to suggest that Nationstar had some motive (financial or otherwise) to wrongfully collect from Ms. May.

Indeed, each mistake was shown at trial to be unintentional or the result of a mistaken belief that Ms. May was delinquent.  For example:

- The erroneous debiting of her account $5,162 actually resulted from an effort to credit her account $51 she had not received more than five years earlier.

Appellate Case: 16-1285     Page: 27     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

- The collection calls made to Ms. May were the result of a belief based on the available computer information and payment history that Ms. May was delinquent. There was no evidence of harassment, yelling or undue threats.

- Nationstar investigated and sought to fix this error. But a good faith mistake (not allowing the credit) prevented it. There was no evidence that this conduct was anything other than an unintended error.

- The loan modification offered Ms. May was on a belief that she was delinquent and complying with applicable Fannie Mae requirements.

- The property inspections conducted by Nationstar were routine, authorized by Ms. May's loan agreement and based on the good faith belief that her loan was seriously delinquent.

- Nationstar's credit reporting was based on its belief that she was delinquent and was merely verifying information given to it by the credit agencies. While the jury found Nationstar's conduct with respect to its credit reporting negligent, it declined to find it was the result of a willful violation.

Likewise, none of the evidence adduced at trial suggests that Nationstar's employees did not care (*i.e.* were reckless as to her status). Quite the contrary, the evidence demonstrated that Nationstar actually listened to May and acted on the information she was providing them by trying to fix the problem.[5] Unfortunately, as detailed above, the problems with Ms. May's account were compounded by Nationstar's ill-fated efforts to *fix* them. But, significantly, no evidence adduced at trial at all indicated that Nationstar's employees were not trying their best to get it right.

---

[5] *See supra* p. 9-12.

Appellate Case: 16-1285    Page: 28    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

Thus, the overwhelming weight of the evidence supports the conclusion that when Nationstar's employees invaded May's privacy, they sincerely *believed in good faith* that May owed them a debt—even though of course they were wrong. And to be sure, May undoubtedly did not produce evidence sufficient to "instantly tilt the scale" in favor of the conclusion that Nationstar acted with an "evil motive" or a "reckless indifference to May's rights."  Perhaps most tellingly, in his closing statement, May's counsel admitted as much, acknowledging that

> [Nationstar's] employees are – we're not here to say these are bad people or anything.  I don't believe that at all.  Neither does my client.  But they . . . could not get to the solution. . . .

Tr. Vol. 5:18–22.

In sum, there is no evidence—much less to a clear and convincing degree—to support the jury's finding that Nationstar's conduct was "outrageous," indicated an "evil motive," or "recklessly disregarded the rights and interests of another person."  *See Hallmark Cards*, 758 F.3d at 1060.  There is a sharp and clear distinction between errors, mistakes, or negligence that can lead to liability, and intentional conduct that meets the high threshold for punitive damages.  Here, Nationstar's conduct falls decisively into the former category, and allowing punitive damages in this case would open the door to punitives in any case involving mistakes or negligence.  Such a result would be neither fair nor consistent with Missouri law.  Thus, because there was insufficient evidence to

Appellate Case: 16-1285     Page: 29     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

meet the high burden of proof Missouri law places on those who seek to recover punitive damages, this Court should set aside the jury's award of $400,000 in punitive damages against Nationstar.

**D. Allowing the Jury's Punitive Damages Award to Stand Would Be Inconsistent with the Weight of Authority in this Circuit and Beyond.**

The weight of authority in this Circuit and beyond supports setting aside the jury's punitive damages award in this case. For example, in *In re Levaquin Prods. Liability Litigation*, 700 F.3d 1161, 1169–70 (8th Cir. 2012), this Court vacated the jury's award of punitive damages based on its finding that the defendant had failed to adequately warn its customers about certain side effects of its drug, Levaquin. Analogous to this case, the Court held that although there was evidence that the defendant drug-maker had reason to know of Levaquin's harmful side-effects and acted negligently in warning its customers about them, there was insufficient evidence as a matter of law to establish that the defendant had acted deliberately, and thus punitive damages were inappropriate. *Id.*

Similarly, here, Nationstar made mistakes that led to liability for invading May's privacy, but there is no evidence that it acted deliberately or in disregard for the rights of its customers. *See also Litchfield*, 845 S.W.2d at 599–600 (finding insufficient evidence for punitive damages where bookshelf fell and injured child at defendant's store because defendant had a well-intentioned safety policy that it

Appellate Case: 16-1285      Page: 30      Date Filed: 05/03/2016 Entry ID: 4395208   RESTRICTED

attempted to follow such that its mistake was not the result of "complete indifference or conscious disregard").

*Freeland v. Financial Recovery Services, Inc.*, 790 F.Supp.2d 991, 993 (D. Minn. 2011), is also instructive. There, the court rejected at the pleading stage the plaintiff's attempt to obtain punitive damages on an invasion of privacy claim against a debt collector because the defendant had "proceeded, albeit erroneously, on a good-faith basis that the information on file was correct." *Id.* Like this case, *Freeland* involved the efforts of a debt collector based on a mistaken belief—in that case, the mistake was that the debtor could be reached at the plaintiff's phone number. *Id.* at 993–94. The debt collector made as many as twenty calls to the plaintiff over a three-month period looking for the debtor, prompting him to bring a suit for invasion of privacy and seek punitive damages. *Id.*

Under Minnesota law,[6] a plaintiff is required to prove a prima facie case for punitive damages before he is allowed to amend his complaint, so the court in *Freeland* considered whether the plaintiff had alleged sufficient facts to support adding a claim for punitive damages. *Id.* Ultimately, the court concluded that the plaintiff had not met his burden to even plead a claim for punitive damages because the debt collector did not "blindly pursue" the plaintiff, but proceeded

---

[6] Similar to Missouri, the standard for punitive damages under Minnesota law requires clear and convincing evidence that the defendant showed "deliberate disregard for the rights and safety of others." *Freeland*, 790 F. Supp.2d at 994.

Appellate Case: 16-1285     Page: 31     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

based on the mistaken belief that plaintiff's phone number was the debtor's phone number. *Id.* at 996. In sum, the court observed that the debt collector had proceeded mistakenly but that there was no basis to suggest that he acted "in deliberate disregard of Plaintiff's right to privacy." *Id.* For that reason, the court rejected the plaintiff's attempt to add a claim for punitive damages. *Id.* at 996–97.

The same reasoning applies here. In fact, the case for punitive damages is even weaker in this case because, unlike the debt collector in *Freeland*, Nationstar actually listened to what May was saying, investigated her account, and tried to fix the error on several occasions. In the meantime, the Nationstar employees who did place calls to May, take photographs of her home, and pursue the erroneous deficiency were acting like the debt collector in *Freeland* in that they honestly believed May was in default.

By stark contrast, when courts have looked favorably on an award of punitive damages in this context, the conduct of the caller has been extreme and truly outrageous. For example, in one instance a district court declined to strike a plaintiff's claim for punitive damages because the defendant debt collector had called her "at least six times a day and at all hours, called her parents and tenant, threatened to change the locks on her house, [and] threatened to disturb her tenants." *See Inzerillo v. Green Tree Serv. LLC*, No. 13-CV-06010-MEJ, 2014 WL 1347175 at *8 (N.D. Cal. Apr. 3, 2014). In another case, a district court

25

declined to grant summary judgment on a plaintiff's claim for punitive damages because the defendant debt collector had called her 54 times at her workplace, allegedly made over 100 calls to family and friends, and allegedly threatened to have the plaintiff jailed. *See Sanchez v. Client Servs.*, 520 F.Supp.2d 1149, 1164–65 (N.D. Cal. 2007). In another case, the district court declined to grant summary judgment on a plaintiff's claim for punitive damages because the defendant debt collector had called the plaintiff over 90 times, and the plaintiff had alleged that some of the calls were threatening. *See Fausto v. Energy Servs. Corp.*, 598 F.Supp.2d 1049, 1057 (N.D. Cal. 2009).

Considering these cases together, a pattern emerges. When district courts consider whether punitive damages are appropriate in cases where a plaintiff alleges invasion of privacy based on attempts to collect a debt, those courts require plaintiffs to present something more than the ordinary diligence a lender would demonstrate in collecting an overdue account. In all three of the cases cited above, the defendant allegedly threatened the plaintiff. However, in the case at bar, May adduced no evidence about the content of the telephone calls she received, or the manner in which the drive-by inspections were conducted, to suggest that Nationstar acted with an "evil motive" or did not care whether she was actually in default. *See Hallmark Cards*, 758 F.3d at 1060. And this pattern stands to reason. Missouri courts have clearly indicated that awards of punitive damages "are an

Appellate Case: 16-1285    Page: 33    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

extraordinary and harsh remedy and should be applied only sparingly."[7] *Trickey*, 705 F.3d at 799 (citation omitted). This is in part because punitive damages are not intended to compensate the plaintiff, but to punish the defendant. *See Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110–11 (Mo. 1996) (en banc). In this case, compensatory damages have already made May whole and she has received a generous attorneys' fee award.[8] Nationstar's conduct was not based on a malicious desire to harm May, but on an ordinary mistake, and conduct predicated on an ordinary mistake should not warrant an award of punitive damages. For those

---

[7] Indeed, a survey of commercial cases where punitive damages have been awarded and upheld further elucidates the distinction between conduct that is outrageous and merits punitive damages, and well-intentioned mistakes or errors that lead to liability for losses sustained but do not justify punitive damages. *See, e.g., Hallmark Cards,* 758 F.3d at 1060 (affirming award of punitive damages based on evidence that defendant made numerous attempts to conceal its misappropriation of Hallmark's trade secrets including ignoring litigation holds, destroying records, and erasing computers as part of a "massive cover-up"); *Schooley*, 502 F.3d at 766–68 (finding punitive damages warranted where evidence showed defendant extermination company intentionally charged customer for more chemicals than it applied at their home, intentionally failed to disclose bug problem it discovered at customer's home, and profited by undertreating terminate problem); *DeLaRosa v. Farmers State Bank*, 474 S.W.3d 240, 246–48 (Mo. Ct. App. 2015) (affirming award of punitive damages based on bank's intentional cover-up of evidence of its wrongdoing); *see also* cases cited *infra* Section II(B)(1) regarding reprehensibility.

[8] Although Nationstar believes the district court's award of attorneys' fees was excessively high and did not properly take into account the fact that May only prevailed on one claim that allows for the recovery of attorneys' fees despite asserting and litigating nine distinct claims, *see* J.A. 2331–32 (Nationstar Opposition to May's Request for Attorneys' fees), Nationstar has elected not to appeal that award.

Appellate Case: 16-1285    Page: 34    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

reasons, the Court should find that the evidence supporting the jury's award of punitive damages was insufficient as a matter of law. As a result, it should reverse the judgment of the district court, and remand with instructions to vacate the award of punitive damages. *See Webner v. Titan Distribution, Inc.*, 267 F.3d 828, 838 (8th Cir. 2001) (indicating disposition).

## II. IN THE ALTERNATIVE, THE PUNITIVE DAMAGES AWARDED BY THE JURY WERE UNCONSTITUTIONALLY EXCESSIVE AND MUST BE REDUCED.

If the Court does not conclude that the evidence supporting the jury's award of punitive damages was insufficient as a matter of law and set them aside altogether, it should conclude in the alternative that they are unconstitutionally excessive and reduce them accordingly. The award was excessive because Nationstar's conduct was not reprehensible, the ratio of punitive damages to compensatory damages was markedly high at 8:1, and comparable civil penalties do not support such a large award. For those reasons, the Court should conclude that the award of punitive damages violated the Due Process Clause of the Fourteenth Amendment.

### A. Standard of Review and Applicable Law.

Whether punitive damages are so exorbitant as to violate the Constitution is a question this Court reviews *de novo. Trickey*, 705 F.3d at 802. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive

28

punitive damages. *Cooper Indus., Inc. v. Leatherman Tool Group*, 532 U.S. 424, 433–34 (2001). Punitive damages are said to be grossly excessive when they shock the conscience of the court or demonstrate passion or prejudice by the trier of fact. *Trickey*, 705 F.3d at 788.

In evaluating whether punitive damages exceed this standard, courts consider: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award); and (3) the difference between the punitive damages award and the civil penalties authorized in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).

**B.    The Jury's $400,000 Punitive Damages Award Based on $50,000 of Actual Damages Was Excessive.**

All three of the factors set forth in *Gore* weigh strongly in favor of reducing the Court's award of punitive damages as Constitutionally excessive. Each factor is addressed below:

**1.    Reprehensibility.**

The most important of the three factors is the reprehensibility of the defendant's conduct. *Gore*, 517 U.S. at 575. In assessing that factor, courts are instructed to look to five sub-factors: "whether . . . the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a

29

reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

When it comes to the first of the reprehensibility factors enumerated in *BMW*, courts are more willing to denominate conduct highly reprehensible when a defendant's actions were physical rather than economic, like they were here. *See, e.g., Lee ex. rel. Lee v. Borders*, 764 F.3d 966, 976 (8th Cir. 2014) (finding conduct reprehensible when an employee of a state-run institution for those with developmental disabilities raped a patient); *Quigley v. Winter*, 598 F.3d 938, 954 (8th Cir. 2010) (finding conduct reprehensible when a landlord repeatedly sexually harassed low-income tenants); *US v. Veal*, 365 F.Supp.2d 1034, 1038–39 (W.D. Mo. 2004) (same).

This is not to say that courts never classify conduct as highly reprehensible when the economic conduct is at issue. However, when courts do make that assessment, they tend to require a showing of deceit or malice. *See, e.g., Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 828 (8th Cir. 2004) *cert. denied*, 543 U.S. 1150 (2005) (finding conduct reprehensible when the defendant's actions "were purposefully designed to maliciously victimize another company, all the while

30

giving [the plaintiff] the impression that it was entering into a long-lasting and mutually profitable relationship"); *Conseco Fin. Serv. Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 824 (8th Cir. 2004) (finding conduct reprehensible when a mortgage company deceitfully engaged in a nationwide pattern of hiring away a competitor's employees for the purpose of stealing customer information); *Lewellen v. Franklin*, 441 S.W.3d 136, 146 (Mo. 2014) (en banc) (finding conduct reprehensible when a car dealer engaged in a pattern of intentionally misrepresenting the terms of a predatory "$49–per–month" payment plan to dozens of low-income customers).

By contrast, in cases where the defendant is found liable based on its attempts to collect a debt, courts often find that the only applicable reprehensibility factor is the financial vulnerability of the plaintiff. In those circumstances, courts acknowledge that mildly culpable conduct should not sustain a large punitive damages award. *See, e.g., Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 153 (4th Cir. 2008) (finding that the only reprehensibility factor met was the plaintiff's financial vulnerability, and so reviewing punitive damages with "a particularly critical eye"); *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 364-67 ("*Bach I*") (finding that the only reprehensibility factor met was the plaintiff's financial vulnerability, and so noting that the plaintiff's ability to "justify the size of the punitive damages award" had been "substantially

undercut[]").  This Court should examine the punitive damages awarded here based on Nationstar's economic conduct with a similarly skeptical eye.

As for the remaining four of the five reprehensibility sub-factors elucidated in *State Farm*, Nationstar admits that May is financially vulnerable relative to Nationstar (sub-factor #2).  However, the other three sub-factors (along with the first, as discussed above), fall decidedly in favor of Nationstar: there was no evidence that Nationstar demonstrated a reckless disregard for the health and safety of others; Nationstar's conduct did not involve repeated actions; and Nationstar's conduct was not the result of malice, trickery or deceit, but rather "mere accident." *See State Farm*, 538 U.S. at 419. Thus, because May has only demonstrated that one of the five reprehensibility sub-factors applies, the Constitutional balance tips in Nationstar's favor.

**2.    Ratio of Punitive to Compensatory Damages**.

The second of the factors enumerated in *BMW* requires courts to consider the ratio of punitive damages to compensatory damages. In evaluating awards of punitive damages, the Supreme Court has divided compensatory damage awards into two classes: nominal or insubstantial, and substantial. *See State Farm*, 538 U.S. at 425. The Court has explained that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of

32

economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW*, 517 U.S. at 582. Following that logic, appellate courts have upheld a number of awards where the ratio of punitive damages to compensatory damages was very high. However, in each case, the compensatory damages were not substantial. *See, e.g., U.S. v. Big D Enters., Inc.*, 184 F.3d 924, 934 (8th Cir. 1999) (upholding $50,000 in punitive damages against $500 in compensatory damages for a ratio of 100:1); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir.2004) (upholding $250,000 in punitive damages against $115 in compensatory damages for a ratio of 2,172:1); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 674–78 (7th Cir. 2003) (upholding $186,000 in punitive damages against compensatory damages of $5,000 for a ratio of 37.2:1).

The contrast in cases where the compensatory damages were substantial is striking. In those instances, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. In fact, the Supreme Court has said more than once that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)); *see also TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 472 (1993).

33

Moreover, the Eighth Circuit has echoed that refrain. *See, e.g.*, *Ondrisek v. Hoffman*, 698 F.3d 1020, 1029 (8th Cir. 2012) (reducing punitive damages award to 4:1 ratio); *Quigley*, 598 F.3d at 955 (same); *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009) (same); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 834 (8th Cir. 2004) (same). And, mindful of that warning, the Eighth Circuit has often reduced punitive damage awards so that they fall below the 4:1 threshold, especially in cases where compensatory damages—as here—are substantial. *See, e.g.*, *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (reducing punitive damages award to 1:1 ratio based on application of *Gore* factors); *Conseco*, 381 F.3d at 825 (8th Cir. 2004) (reducing punitive damages award to 2:1 ratio even though defendant's conduct was reprehensible); *see also Wallace*, 563 F.3d at 362 (finding that a damages award of $30,000 "is not a nominal amount that might excuse a higher ratio.").

In fact, this Circuit has hewn to this guideline even in cases where the defendant's conduct was heinous. *See, e.g., Quigley*, 598 F.3d at 955 (4:1 ratio in case involving sexual harassment of low-income tenants); *Stogsdill*, 377 F.3d at 834 (4:1 ratio in case involving nursing home malpractice resulting in death); *Eden Elec.*, 370 F.3d at 829 (4.5:1 ratio in case where defendant had devised a scheme of fraud and evinced an intent to "f***" and "kill" the plaintiff's business).

Appellate Case: 16-1285    Page: 41    Date Filed: 05/03/2016 Entry ID: 4395208   RESTRICTED

These cases suggest that a ratio of 4:1, even in heinous cases, should form the ceiling on punitive damages when compensatory damages are substantial. But the guideline which may prove most helpful in fixing a precise ratio is the Sixth Circuit's analysis of a case presenting similar facts. In *Bach I*, the defendant bank sought to collect on a delinquent account that had been opened in the name of a customer named Dorothy Bach. 149 F. App'x at 356. When the bank contacted her, Bach was unaware that the account existed, because it had been fraudulently opened in her name. *Id.* Despite Bach's informing the bank that the account did not belong to her, the bank continued to seek collection on the account. *Id.* at 357. At trial, bank executives admitted that they were aware that the account had been opened fraudulently. *Id.* Eventually, Bach brought suit, and a jury awarded her $400,000 in compensatory damages for willful violation of the Fair Credit Reporting Act (FCRA), and $2,628,600 in punitive damages. *Id.* at 358.

In considering whether the punitive damages were unconstitutionally excessive, the Sixth Circuit applied the test developed in *BMW*. As here, the Sixth Circuit held that only one of the reprehensibility factors had been met, because Bach was financially vulnerable. *Id.* at 365. For that reason, the court explained that the reprehensibility prong of the *BWM* test "d[id] not support the large punitive damage award" assessed. *Id.* at 366.

Appellate Case: 16-1285     Page: 42     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

When reviewing the second prong of the *BMW* test, the Sixth Circuit observed that the ratio of punitive to compensatory damages—6.6:1—was "alarming." *Id.* The court noted that the disparity suggested that the award of punitive damages was duplicative of the compensatory damages to which Bach was entitled, because Bach's compensatory damages had already taken into account the "outrage and humiliation" Bach had experienced. *Id.*

After determining that the only relevant civil penalty was the civil penalty available to the Federal Trade Commission for willful violations of the FCRA, in the amount of $2,500, the Sixth Circuit concluded that the award of punitive damages violated the Due Process clause. *Id.* at 367. Accordingly, the Sixth Circuit reversed and remanded the issue of punitive damages. *Id.* at 368.

On remand, the district court reduced the punitive damages to $2,228,600, to address the Sixth Circuit's "concern that the jury had erroneously incorporated the compensatory damages award into the amount of punitive damages." *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 (6th Cir. 2007) ("*Bach II*"). In reviewing the punitive damages award a second time, the Sixth Circuit explained that "the vulnerability of a victim, without more, ought not be the basis for" an excessive award of punitive damages. *Id.* at 155. Accordingly, the Sixth Circuit reversed and remanded with instructions to enter an order of remittitur further reducing the punitive damages to a total of $400,000—for a ratio of 1:1. *Id.* at 156.

Appellate Case: 16-1285     Page: 43     Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

With *Bach I*, *Bach II*, and the weight of Eighth Circuit precedent in mind, it becomes evident that the ratio of punitive to compensatory damages in this case—8:1—was unconstitutionally excessive. Considering Nationstar's conduct amounted to no more than a good faith, albeit unfortunate, mistake, Nationstar submits that a ratio of 1:1 (punitive damages of $50,000) would more closely align with the dictates of the Fourteenth Amendment and national punitive damages jurisprudence. *See id.*

### 3. **Comparable Civil Penalties**.

The final factor enumerated in *BMW* requires courts to consider the difference between the punitive damages award at issue and the civil penalties authorized in comparable cases. Although as a state law tort there are no civil penalties for invasion of privacy claims, cases involving violations of the FCRA and/or FDCPA involve similar underlying facts/conduct and are instructive. At least one Circuit Court of Appeals has found that, in cases concerning violations of the FCRA, there are no comparable civil penalties to consider. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 724 (3d Cir. 2010). On similar facts, however, another circuit court observed that the maximum penalty the Federal Trade Commission can seek for knowing violations of the FCRA is $2,500. *Bach I*, 149 F. App'x at 367. And another circuit court found it relevant that the Federal Debt Collection

Practices Act only authorizes damages in the amount of $1,000. *See Bennett v. Am. Med. Response, Inc.*, 226 F. App'x 725, 728 (9th Cir. 2007).

Thus, to the extent this third factor comes into play here, cases involving similar underlying conduct have found it relevant that civil penalties only amount to a few thousand dollars. Certainly, this factor does not at all support a punitive damages award of $400,000.

## C. The $400,000 Punitive Damages Award Must Be Reduced.

In conclusion, none of the three factors the Supreme Court laid out in *BMW* favor May, only one of the five reprehensibility sub-factors applies, and a review of case law addressing the propriety of damage ratios suggests that the ratio of punitive to compensatory damages in this case far exceeded constitutional boundaries. The paucity of evidence indicating that May's punitive damages award was constitutional underscores Nationstar's principal argument—that there was no basis for any award of punitive damages in the first place. However, if this Court concludes that May adduced clear and convincing evidence that Nationstar invaded her privacy with an evil motive, then it should hold in the alternative that the award of punitive damages in this case transgressed the boundaries set by the Due Process Clause of the Fourteenth Amendment. Accordingly, in that case, the Court should reverse the jury's verdict and remand with instructions to the district court to enter an order of remittitur reducing the punitive damages to $50,000—for a ratio of 1:1.

38

*See Quigley*, 598 F.3d at 959 (indicating disposition); *Ondrisek*, 698 F.3d at 1031 (same).

## CONCLUSION

In this case, it is plain that Nationstar made an error in attempting to collect a debt May did not owe. But it is equally plain that May has been compensated for Nationstar's error: between the damages she received for negligent violation of the FCRA, the damages she received for invasion of privacy, and the generous award of attorneys' fees, May has recouped an amount equal to the entire value of the home on which she took out the mortgage that became the subject of this litigation. And though May was able to demonstrate by a preponderance of the evidence that Nationstar made a mistake, she was not able to demonstrate that Nationstar made that mistake willfully or with an evil motive.

Thus, because there is no clear and convincing evidence that Nationstar willfully invaded May's privacy with an evil motive, this Court should hold that the evidence supporting the jury's award of punitive damages was insufficient as a matter of law. *See Trickey*, 705 F.3d at 799. Accordingly, it should reverse the judgment of the district court, and remand with instructions to vacate the award of punitive damages. *See Webner*, 267 F.3d at 838 (indicating disposition). In the alternative, the Court should hold that the punitive damages exceeded the limits set by the Due Process Clause of the Fourteenth Amendment, and should reverse and

39

remand with instructions to the district court to enter an order of remittitur reducing the punitive damages to $50,000. *See Quigley*, 598 F.3d at 959 (indicating disposition).

Appellate Case: 16-1285    Page: 47    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED

DATED: May 3, 2016

Respectfully submitted,

 */s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson, P.C.
State Bar No. 20039200
TILLOTSON LAW
750 N. St. Paul Street, Suite 610
Dallas, Texas 75201
(214) 382-3041 – telephone
(214) 501-0731 – facsimile

**ATTORNEYS FOR APPELLANT
AND CROSS-APPELLEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on counsel for via ECF on the May 3, 2016.

 */s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson

41

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that the brief complies with the type-volume limitations.

1. This brief contains 9,183 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2013 in Times New Roman, 14 point.

3. The undersigned understands a material misrepresentation in completing this certificate, of circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7), may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

4. Pursuant to Local Rule 28A(h)(2), the electronic version of this brief and addendum have been scanned for viruses and these documents are virus-free.


_/s/ Jeffrey M. Tillotson_____
Jeffrey M. Tillotson
Attorney for Appellant and
Cross-Appellee Nationstar
Mortgage, LLC

Dated: May 3, 2016

Appellate Case: 16-1285    Page: 49    Date Filed: 05/03/2016 Entry ID: 4395208  RESTRICTED